# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

REBECCA CLARK, SCOTT,       :
SIEGFRIED, and IVAN         :       No. 3:18-cv-00660
SANTIAGO,                   :
                            :
    Plaintiffs,             :
                            :
       v.             :       (SAPORITO, M.J.)
                            :
DELAWARE VALLEY             :
SCHOOL,                     :
                            :
    Defendant.              :

## <u>MEMORANDUM</u>

This matter is before the court on the cross motions for partial summary judgment filed by the defendant, Delaware Valley School District, and by the plaintiffs. (Doc. 20; Doc. 22). On March 23, 2018, the plaintiffs initiated this action by filing a complaint seeking relief under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* and under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. Ann. § 260.1.

## I.   *Statement of Facts*

The defendant Delaware Valley School District (the "District") is a

school district within the Middle District of Pennsylvania where its principal place of business is located in Milford, Pennsylvania.   The District authorized the creation of a school police force in the fall of 2007.   The plaintiffs are Rebecca Clark, Scott Siegfried, and Ivan Santiago, and at all relevant times, they were school police officers employed by the District.   The plaintiffs regularly worked five eight-hour shifts weekly, plus an uncompensated half-hour lunch each day, and the plaintiffs were not completely released from their duties during the lunch half-hour.   In late November 2017, the police officers began working eight-hour days, rather than the eight and one-half hour days.   In addition, the plaintiffs were not provided lockers and as a result they were required to spend approximately thirty minutes of uncompensated time daily changing into and out of their uniforms and protective gear before and after work. Plaintiff Clark alleged that she accumulated approximately 120 of uncompensated lunch time while the plaintiffs Siegfried and Santiago accumulated approximately 285 hours of uncompensated lunch time through March 23, 2018.  The plaintiff Clark accumulated approximately 100 hours of uncompensated time dedicated to covering special events while the plaintiffs Siegfried and Santiago accumulated approximately

180 hours of uncompensated time dedicated to covering special events. Plaintiff Clark has accumulated 52 hours of uncompensated time donning and doffing her uniform and gear while plaintiffs Siegfried and Santiago have accumulated approximately 270 hours of uncompensated time donning and doffing their uniforms and protective gear.  All three plaintiffs accumulated approximately 75 hours of uncompensated travel time going to and returning from uncompensated after-school events. The plaintiffs' complaint consists of a claim for unpaid overtime compensation, an additional amount as liquidated damages, reasonable attorneys' fees and costs under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*., and under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. Ann. § 260.1.  The plaintiffs alleged that on November 22, 2017, the District provided the plaintiffs with a memorandum dated February 15, 2007 which stated that the plaintiffs are exempt employees under the FLSA.

The District filed its motion for partial summary judgment seeking determinations from this court that (1) the FLSA does not apply to this case until August 22, 2016, because prior to that date, the plaintiffs were part of a school police force of less than five officers; (2) The plaintiffs'

claims for liquidated damages are precluded because the district reasonably sought out the advice of counsel, explained the facts to counsel, and relied on counsel's advice in maintaining the plaintiff's classification as exempt employees; and (3)  that the plaintiffs be precluded from seeking damages for time related to "donning and doffing" their uniforms and gear.

## II.   *Legal Standards*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). Thus, "when presented with cross motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party."

*Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d. 418, 433 (M.D. Pa. 2014) (citation omitted). "[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions. *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008)).

## III.   Discussion

### A. The District's Motion for Partial Summary Judgment

The District seeks the following rulings from the court: (1) The FLSA does not apply to this case until August 22, 2016, because before that date the plaintiffs were members of the school police force which consisted of less than five officers; (2) the plaintiffs' claims for liquidated damages are precluded because the District reasonably sought the advice of counsel and relied on counsel's advice when it classified the plaintiffs as exempt employees; and (3) the plaintiffs are precluded from seeking damages for time related to "donning and doffing" of their uniforms and gear.

### 1. The Application of the FLSA

The Fair Labor Standards Act ("FLSA") was enacted in 1938 to

protect covered workers from substandard wages and oppressive working hours. *Tyger v. Precision Drilling Corp.,* 308 F. Supp. 3d 831, 840 (M.D. Pa. 2018) (citations omitted). To accomplish this goal, "[t]he FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Id*. Among these guarantees is a section stipulating that covered employers may not employ any employee "for a workweek longer than forty hours unless such employee receives compensation for his employment . . . at a rate not less than one and one-half times the regular rate at which he is employed." *Id*. An employer who violates this section may be held liable for backpay, liquidated damages, and attorney's fees.

The District maintains that its school police force was comprised of less than five officers until August 22, 2016, and therefore the FLSA's maximum hour requirements in any workweek did not apply until that date. The plaintiffs argue that the District employed five officers at all times material to the plaintiffs' complaint, i.e. March 23, 2015, through August 22, 2016. The FLSA states in pertinent part as follows:

> The provisions of [29 U.S.C. § 207] shall not apply with respect to—
>
> (20) Any employee of a public agency who in any

> workweek . . . is employed in law enforcement
> activities . . . if the public agency employs during
> the workweek less than 5 employees . . . in law
> enforcement activities. . . .

29 U.S.C. § 213(b)(20).

Before a public employer may qualify for the § 207(k) exemption, however, two things must be true: "(1) the employees at issue must be engaged in fire protection or law enforcement within the meaning of the statute and (2) the employer must have established a qualifying work period." *Calvao v. Town of Framingham*, 599 F.3d 10, 14 (1st Cir. 2010) (citing *O'Brien v. Town of Agawam*, 350 F.3d 279, 290 (1st Cir. 2003)). The employer bears the burden of proving that these conditions are satisfied. *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1143 (3d Cir. 1983) (noting that "[t]he burden of proof is on the employer to establish an [FLSA] exemption"); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). To meet this burden, the employer must demonstrate "that the employee and/or employer come 'plainly and unmistakably' within the exemption's terms." *Lawrence*, 527 F.3d at 310 (observing that FLSA exemptions should be construed narrowly and against the employer (citing *Arnold*, 361 U.S. at 392)).

The District contends that its school police force was comprised of

only four officers at its inception in 2007: Mark Moglia (Chief), Christopher Burns, plaintiff Santiago, and plaintiff Siegfried, all of whom were initially appointed by the board. The District maintains that when Officer Burns resigned in January of 2011, its police force was reduced to three members. A replacement for Officer Burns was not hired until February 2013, when Officer Martin Gaughan joined the police force, bringing it back to a total of four officers. The District maintains that only with the appointment of plaintiff Clark and Officer Paul Cavallaro in August 2016, bringing the total size of the District's police force to six officers, did it meet the five-or-more-officers threshold.

The plaintiffs assert that Michael Chlebowski was also a duly sworn school police officer from 2007 through the present, thereby bringing the school police force to a total of five or more members during the entire relevant period. (Doc. 28, at 8). The plaintiffs offer the declaration of plaintiff Siegfried wherein he stated that at the time of his appointment as a school police officer in 2007, Chlebowski was a sworn school police officer. (Doc. 26-1, at 1). Chlebowski's duties were mainly traffic control, but Siegfried stated that Chlebowski assists in maintaining good order in the schools, he wears a "badge, and other

School Police accoutrements." (*Id.*).  Thus, the resolution of this section of the motion hinges on whether Chlebowski was engaged in law enforcement activities.

In determining what constitutes law enforcement activities, we are guided by the Office of Personnel Management's (OPM) rules as to what constitutes law enforcement activities in 5 C.F.R. § 551.216(b) which is set out as follows:

> b) Law enforcement activities. Law enforcement activities involve work directly and primarily concerned with:
>
> (1) Patrol and control functions that include patrolling an area to enforce law and order and to protect the lives, property, and civil rights of individuals through the prevention and detection of criminal acts; responding to complaints, violations, accidents, and emergencies; investigating for clues at the scene of a crime, interviewing witnesses, and evaluating evidence to locate suspects; and apprehending and arresting persons suspected of, or wanted for, criminal violations under a statutorily prescribed arrest authority;
>
> (2) Executing the orders of a Federal court, including serving civil writs and criminal warrants issued by Federal courts; tracing and arresting persons wanted by warrants; and seizing and disposing of property under court orders;
>
> (3) Planning and conducting investigations

relating to alleged or suspected violations of criminal laws, including the arrest of suspected or wanted persons under a statutorily prescribed arrest authority;

(4) Security functions in a correctional institution involving direct custody and safeguarding of inmates charged with or convicted of violations of criminal laws; or

(5) Rescue and ambulance functions that provide the primary (i.e., the first called) service in connection with law enforcement activities described above.

In determining whether Chlebowski is engaged in law enforcement activities, we look to 5 C.F.R. § 551.216(c)(2) which states, in pertinent part, as follows:

c) Engaged in law enforcement activities. The following employees are engaged in law enforcement activities for the purpose of determining possible application of section 7(k) of the Act as provided for in § 551.501(a)(1) and (5) and § 551.541:

\* \* \* \*

(2) Employees whose primary duties involve patrol and control functions performed for the purpose of detecting and apprehending persons suspected of violating criminal laws;

In support of its motion on this issue, the District offers the Board Meeting Minutes for April 6, 2006, which reflects that Chlebowski was

hired on April 6, 2006, for the position of "Traffic Control." (Doc. 29-1, at 1-2). The Board Meeting Minutes of July 14, 2016, submitted by the District show that Chlebowski resigned from his position effective June 10, 2016 (Doc. 29-2, at 1, 3), and he was subsequently rehired to the same position on October 20, 2016, in a part time capacity. In addition, the District posits that the job description for Chlebowski's traffic control officer position is fundamentally different from the qualifications, requirements, essential functions, and duties of a school police officer. (Doc. 29, at 6; Doc. 29-4; Doc. 23-6, at 100-04). While the District's contention has some merit, there is an overlap in some of the functions of both positions. Both positions require reporting to and evaluation by the Director of Administrative Services with the additional reporting to and evaluation by the Chief of School Police for the school police officer position. (Doc. 29-4; Doc. 23-6, at 100, 104). The "qualifications" of the traffic control officer position are contained in the qualifications for a school police officer, but additionally, the school police officer position requires: a demonstrated working knowledge of investigative, interview techniques, and supervisory skills; five years of law enforcement experience; and Pennsylvania Act 120 certification. (*Id.*). Eight of the

nine "requirements" of a traffic control officer are contained in the eleven requirements of a school police officer.  (Doc. 29-4, at 1; Doc. 23-6, at 100, 103).  Many of the "essential functions" and "duties" are different between the two positions; however, the job description of traffic control officer contains the following "duties:"

1. Control and direct motor vehicle traffic both into and within the school campuses.

2. Assist other school officials with traffic flow and/or parking at school events.

3. Report to school officials any unsafe or reckless drivers, and any other unusual or suspicious activities.

4. Maintain parking space use and report any issues to appropriate authorities.

5. Complete any other tasks as assigned by appropriate school officials.

(Doc. 29-4).  Thus, we find that the District has not met its burden plainly and unmistakably to show that it is entitled to the exemption's terms, and therefore there is a genuine issue of fact whether Chlebowski's duties fall within the control and patrol function contained in OPM's guidelines for what constitutes law enforcement activity.

Both job descriptions contain the same notice that the "job

description does not state or imply that these are the only duties to be performed by the employee occupying this position," and that other duties requested by the administrator or supervisor may be required to be performed. (Doc. 23-6, at 104; Doc. 29-4, at 2).

The District submitted the October 20, 2017, memorandum prepared by the District Director of Administrative Services, Christopher Lordi, to show that Chlebowski was not included on the list of recipients of the memorandum. (Doc. 23-6, at 105-07). The District contends that the purpose of the memorandum was to "provide further clarification for the Officers concerning their job description, duties, and work plan. . . ." (Doc. 29, at 6-7). We are not persuaded by this argument. A review of the memorandum does not reflect the purpose of its preparation or its submission to the recipients listed thereon. Mr. Lordi testified at his deposition[1] that the memorandum came about upon request of the officers in November or December 2016 for clarification purposes. (Doc. 26-1, at 37). We note that the memorandum contains the requirement that 1,580 hours must be worked for each school year which is equal to

---

[1] We note that the plaintiffs conducted this deposition under Fed. R. Civ. P. 30(b)(6). The state of the record reflects that the District has not conducted any discovery under the Federal Rules of Civil Procedure.

190 days plus 60 event hours.  The job descriptions submitted do not contain that requirement.  Further, Mr. Lordi was not asked about Chlebowski or the job description of traffic control officer by either counsel at his deposition.

Under these circumstances, the District's motion for partial summary judgment on this issue must be denied.

### 2. Liquidated Damages

Next, the District moves the court for summary judgment on the plaintiffs' claims for liquidated damages.  The District asserts that the plaintiffs are not entitled to liquidated damages because it reasonably relied on the advice of counsel in maintaining the plaintiffs' exempt status based upon a Department of Labor opinion letter dated February 15, 2007.  In response, the plaintiffs contend that the District made no effort to determine the application of the FLSA despite complaints that the Act was being violated.

The FLSA provides that "[a]n employer who violates the [overtime] provisions of . . . section 207 . . . shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation, . . . and in an additional equal amount as liquidated

damages. . . ." 29 U.S.C. § 216(b). The liquidated damages provision amounts to a Congressional recognition that failure to pay the statutory minimum and overtime wages may be so detrimental to the maintenance of the minimum standard of living "necessary for health, efficiency and general well-being of workers" that double payment must be made to compensate employees for losses they might suffer by not receiving their lawful pay when it was due. *See Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999); *see also Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991).

Congress subsequently mitigated the harshness of the liquidated damage provision of Section 216(b) with the enactment of Section 260 of the Portal-to-Portal Act. *Brooks*, 185 F.3d at 137. This section permits the district court in its sound discretion to withhold or reduce the amount of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. In *Martin*, the Third Circuit Court of Appeals explained:

> The good faith requirement is a subjective one that "requires that the employer have an honest intention to ascertain and follow the dictates of the Act.". . . The reasonableness requirement imposes an objective standard by which to judge the employer's conduct. . . . Ignorance alone will not exonerate the employer under the objective reasonableness test. . . .
>
> If the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages.

*Martin*, 940 F.2d at 907-08 (quoting *Williams v. Tri–County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir.1984)) (emphasis in original).

In support of its position that the District acted in good faith and reasonably relied upon the advice of counsel in maintaining the plaintiffs' exempt status classification, the District submits that the contents of emails between the District's superintendent and its labor counsel, which were produced to the plaintiffs, show the District's candor in describing the plaintiffs' pay structure, work schedule, duties, and the District's willingness to schedule a follow-up telephone call with its labor counsel. (Doc. 21, at 17).  In addition, the District contends that its labor counsel provided the District with a Department of Labor opinion letter regarding the exempt status issue and counsel's ultimate opinion that

the plaintiffs are exempt employees.  (*Id.* at 18).  Finally, the District maintains that Mr. Lordi's deposition testimony demonstrated that the District relied on the advice of its labor counsel.  (*Id.*).

We begin our analysis with emails between the District's superintendent and its labor counsel.  The superintendent emailed labor counsel November 6, 2017, at 1:52 p.m. and informed him that some of the school police officers "have been badgering us to give them something in writing that better details their work requirements." (Doc. 21-11, at 7).  He further informed counsel that Mr. Lordi and the Chief of the school police force put together the "attached memo" and worked on revising the job description.  The superintendent asked counsel two questions: [(1)] "Are we saying anything we shouldn't say or maybe say in a better way? [(2)] What other legal issues might arise from our efforts to quantify things in a memo that might come back to haunt us?" (*Id.*).  The following morning, the superintendent emailed counsel again at 8:15 a.m. and asked if "any hours over 8 worked in a day are at an overtime rate or can they be straight hours toward the 60 hours they need to work during a year?" (Doc. 21-10, at 2).  Counsel responded at 12:05 p.m. that he was available to speak on Thursday [November 9, 2017,] between 11:00 a.m.

and 3:00 p.m.  They agreed to speak that day at 11:00 a.m.

The District argues that its labor counsel provided it with the "Department of Labor opinion regarding the exempt status of school police (albeit, in a different jurisdiction) and his ultimate opinion that the Plaintiffs here are exempt employees."  (Doc. 21, at 18).  We have reviewed the DOL opinion letter and note the following: (1) it is dated February 15, 2007; (2) it contains no addressee; (3) it concerned whether school resource officers, whose primary duty is to provide safety and security of the students, staff, and property within a school system, qualify for an administrative exemption under the FLSA; (4) the letter found that the school resource officers "perform office or non-manual work because an SRO's typical work day consists of working in an office writing reports or performing similar deskwork, performing training, and providing recommendations and advice to faculty and staff." (Doc. 21-11, at 4); and (5) the primary duty of the SRO is office work. Under that backdrop, the Department of Labor opined that the school resource officers qualified for an administrative exemption.  Further, the letter did not contain the facts of the instant matter, school resource officers are different than school police officers as testified to by Mr. Lordi, and the

letter was not requested by the District from the Department of Labor.

The email from labor counsel to the superintendent (November 9, 2017, at 11:10 a.m.) does not contain his opinion, but rather, only a web address to access the DOL opinion letter. The state of the record is devoid of any formal advice that labor counsel gave to the superintendent other than forwarding the DOL opinion letter. Nor does the record indicate whether labor counsel answered the questions asked of him by the superintendent in his emails to counsel. The District further asserts that it relied upon the labor counsel's advice and refers us to Mr. Lordi's deposition testimony. (Doc. 21, at 18). In fact, Mr. Lordi testified that the [DOL] letter was acquired by counsel at the end of September or beginning of October 2017 regarding the school police officers and the preparation of his memo. (Doc. 21-6, at 58). Nowhere in the referenced testimony does it state that the District relied upon counsel's opinion. We have not been provided with any discovery from the District to ascertain the understanding of the superintendent or to review the advice of labor counsel. In fact, when questioned about the email exchange of November 7, 2017, between the superintendent and labor counsel, Mr. Lordi testified that it was "sent to the wrong Chris" and he saw it for the first

time at his deposition which was taken on March 7, 2019.  (*Id.* at 62).

Under these circumstances, we must deny the motion on this issue.

### 3. Donning and Doffing of Uniforms and Gear

The District argues that the plaintiffs should not be compensated

for donning and doffing their uniforms and gear because school police

officers are not required to change into or out of their uniforms and gear

at the District.  The plaintiffs contend that donning and doffing uniforms

and gear are an integral and indispensable part of the principal activities

for which the officers are employed.

It is undisputed that the plaintiffs are required to be in uniform

while on duty and that there is no requirement that they change at the

District.  (Doc. 20-1 ¶¶ 27, 29; Doc. 26 ¶¶ 27, 29).  The District contends

that the plaintiffs have the option to change into their uniforms and gear

in their respective offices, which the plaintiffs deny.  (Doc. 20-1 ¶ 28; Doc.

26 ¶ 28).  In addition, plaintiff Siegfried, in his declaration, stated that

during his tenure as a school police officer for the District, he and his

colleagues have always changed into and out of their uniforms and

equipment at their respective homes as the District has not provided a

location on school premises.  (Doc. 26-1 ¶ 5).  Nevertheless, the parties

agree that the Third Circuit has not specifically addressed the issue before us.  (Doc. 21, at 19; Doc. 28, at 11).  The plaintiffs argue that it is of no importance whether the officers are required to change at the District.  They rely upon *Lemmon v. City of Leandro*, 538 F. Supp. 2d 1200 (N.D. Cal. 2007), where a police officer brought an action against the city and sought a declaration that the time spent donning and doffing his uniform and attendant equipment was compensable under the FLSA. There, the city's police department claimed that departmental policies allowed officers the option of donning and doffing at home.  *Id.* 538 F. Supp. 2d at 1202.  *Lemmon* rejected a Department of Labor advisory opinion which stated that if the employees have the option and ability to change into the required gear at home, it is not a principal activity.  *Id.* at 1207.  The court in *Lemmon* went on to hold that the integral and indispensable nature of the donning and doffing makes those activities principal to a police officer's duties.  *Id.* at 1208.  The court found that police uniforms themselves form part of an officer's equipment because they are part of a "continuum of force."  *Id.* at 1204. The court then reasoned that, "unlike practically any other profession," the police uniform is necessary to the principal work performed and, therefore,

there is "no distinction" between an officer's clothes and his or her protective gear. *Id*. at 1205.  Despite evidence that the plaintiffs had the option to change at home, the *Lemmon* court concluded that the fact that "most" officers used lockers at the police station to don and doff was a "strong indicia" that such practice was a "de facto" requirement. *Id*. at 1206; *see also Maciel v. City of Los Angeles*, 542 F. Supp. 2d 1082 (C.D.Cal. Mar. 21, 2008) (finding that "for all practical purposes" police equipment had to be donned and doffed at the station). Finally, the court ruled that even if the officers were given the option to change at home, there is no explicit requirement that there be "a location limitation [in] the analysis for finding compensability under the FLSA." *Lemmon*, at 1206.

The District relies upon *Bamonte v. City of Mesa*, 598 F.3d 1217, 1225-26 (9th Cir. 2010), where the Ninth Circuit held that police officers' donning and doffing of their uniforms is not compensable under the FLSA when the police department does not require the donning and doffing to occur at the workplace.  There, the court relied upon the reasoning in *Abbe v. City of San Diego*, No. 05cv1629 DMS (JMA), 2007 WL 4146696 (S.D. Cal. Nov. 9, 2007), where the court stated that:

- 23 -

> It is important to note . . . that the relevant inquiry is not whether the uniform *itself* or the safety gear *itself* is indispensable to the job—they most certainly are—but rather, the relevant inquiry is whether the nature of the work requires the donning and doffing *process* to be done on the employer's premises.

*Id.* at *7 (emphasis in the original).  We find the reasoning in *Bamonte* to be more persuasive than the reasoning in *Lemmon*.  In addition, despite the absence of precedent on this issue in this judicial circuit, we look to the analysis the Third Circuit undertook in *Rosano v. Township of Teaneck*, 754 F.3d 177 (3d Cir. 2014), where the court held that the time spent by police officers donning and doffing uniforms and equipment was subject to the FLSA exclusion, 29 U.S.C. § 203(o), and thus the officers were not entitled to additional compensation for time spent changing clothes. *Rosano* contained a collective bargaining agreement, the express terms of which were silent on whether the officers were entitled to compensation for time spent donning and doffing.  So, the court analyzed the issue by determining whether there was a "custom or practice" under the agreement of excluding change time from compensable hours worked. The court concluded that there was a custom or practice under a bona fide collective bargaining agreement of not compensating the officers for

time spent donning and doffing, and that the vast majority of the time in question was spent changing "clothes," as defined by the Supreme Court in *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014). Because both elements necessary for application of the § 203(o) exclusion applied, the Teaneck officers were precluded from seeking compensation for time spent donning and doffing their uniforms and safety equipment.

Based upon the foregoing, we find that there is no genuine issue of material fact whether the school police officers are entitled to compensation for donning and doffing their uniforms and gear, and thus the District is entitled to summary judgment on this issue.

### B. The Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs have moved for partial summary judgment on four issues: (1) Whether the District violated the FLSA by misclassifying the plaintiffs as FLSA exempt administrative employees; (2) Whether the District violated the FLSA's overtime provisions by not paying the plaintiffs one and one-half times their regular hourly rate for hours worked over 40 in a given week; (3) Whether the District's failure to comply was willful; and (4) Whether the District is liable for liquidated damages for a failure to show good faith and reasonable grounds for

violating the FLSA.

### 1. Administrative Exemption

The plaintiffs contend that the District misclassified them as exempt administrative employees. The District argues that the plaintiffs' primary duties consisted of non-manual work thereby allowing the District to classify them as exempt. We begin our analysis with a review of the pertinent exemption section at issue.

> (a) **Minimum wage and maximum hour requirements.** The provisions of sections 6… shall not apply with respect to—
>
> > (1) Any employee employed in a bona fide executive, administrative, or professional capacity …

29 U.S.C. § 213(a)(1). The administrative exemption applies to employees who (1) earn a certain minimum salary; (2) have as their primary duty the performance of office or non-manual work directly related to management or business operations of the employer or the employer's customers; and (3) have the primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). The District concedes that the first element of the administrative exemption is not in dispute because

all three plaintiffs earn the required minimum salary.  (Doc. 30, at 7 n.3).

Therefore, we focus our attention on the second and third criteria to

arrive at our decision on this issue.

"As to the administrative nature of the employee's primary duties,

the employee's activities must be directly related to assisting with the

operation of the business of the employer, as distinguished from, for

example, working on a manufacturing production line or selling a product

in a retail or service establishment." *O'Bryant v. City of Reading*, 197

Fed. App'x 134, 136 (3d Cir. 2006).  "An employee's primary duty is

defined as work that involves over 50% of the employee's work time." *Id.*

(citing *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 699 (3d Cir.1994)).

"However, this standard is flexible, depending on the importance of the

administrative duties conducted, the frequency of use of discretionary

power, the freedom from supervision, and comparative wages" *Id.* at 136-

37 (citing *Guthrie v. Lady Jane Collieries*, 722 F.2d 1141, 1144 (3d

Cir.1983) (concluding "a sufficient presence of pertinent factors" was

enough to find managerial duties as the employee's primary duties even

though they were performed less than 50% of the work time); *Lott v.*

*Howard Wilson Chrysler–Plymouth*, 203 F.3d 326, 331 (5th Cir.2000) ("As

a general rule, an employee's "primary duty" involves over 50% of the employee's work time. And yet, flexibility is appropriate when applying this rule.")).

In its regulations, the Department of Labor defines "primary duty" as:

> the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider . . . include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

Generally speaking, "[w]hen an employee brings a claim under the FLSA, he ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'" *Rosano*, 754 F.3d at 188; *Carter v. City of Philadelphia*, 417 F. Supp. 3d 639, 644 (E.D. Pa. 2019). "Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly," the Supreme Court recently held that

"there is no reason to give them anything other than a fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). That is, one that is "neither narrow nor broad." *Sec'y U.S. Dep't of Labor v. Bristol Excavating, Inc.*, 935 F.3d 122, 135 (3d Cir. 2019). The question whether an employee is exempt is a mixed question of law and fact. *Pignataro v. Port Auth. of New York & New Jersey*, 593 F.3d 265, 268 (3d Cir. 2010). The burden of proving these exemptions is upon the employer, and if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966); *Martin*, 940 F.2d at 900.

Here, we analyze the facts as contained in the job descriptions, the deposition testimony of Mr. Lordi, and the declarations of the plaintiffs.

Each of the plaintiffs have submitted a declaration which itemizes their respective duties.  They all perform the following duties:

> 1.  Patrolling the halls of the school;
>
> 2.  Physically checking the door of the building;
>
> 3.  Investigating complaints of contraband, including weapons;

4. Taking contraband, including weapons, away from students;

5. Breaking up fights;

6. Acting as school crossing guard;

7. Maintaining order in the event of an emergency;

8. Following established lock down or evacuation procedures in the event of an emergency;

9. Maintaining order at school events;

10. Crowd control at school events;

11. Maintaining a physical presence at school events;

12. Preparing daily logs summarizing the day;

13. Acting as a truancy officer; and

14. Making arrests for summary violations and detaining suspects for local and state law enforcement.

(Doc. 23-2: Doc. 23-3; Doc. 23-4). With respect to Chief Moglia, Mr. Lordi testified that the Chief does not have the ability to fire or discipline school police officers, although he does have the ability to instruct them on how to conduct their work. (Doc. 23-1, at 11). The Chief submits monthly reports to Mr. Lordi that the other officers are not required to submit. (*Id*. at 12). Mr. Lordi stated that the primary duty of school police officers

is the "safety and security of the students and faculty, any employee in their building." (*Id.* at 27). He further described their duties to include monitoring their buildings to make sure entries and exits are secure (physically patrol the buildings and view security cameras); serving as a crossing guard; complete walking checks throughout the interior and exterior of the buildings; being visible in the hallways (described as their "main duty"); preparing building budgets for the drug and alcohol education program known as D.A.R.E. (approximately $750 per officer); assisting administrators with disciplinary issues including bus discipline, truancy, fights (including physically breaking-up a fight), and weapon possession; attending assemblies and other group events (including speaking on safety topics); participate in the student assistant program; training administrators and professional staff on lockdown and evacuation procedures; and submitting daily logs of activity; (*Id.* at 24-36).

Neither the plaintiffs nor the District offered evidence of the percentage of time the plaintiffs spent doing the various tasks. See 29 C.F.R. § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary

duty of an employee."). An appropriate inquiry is to examine the plaintiffs' primary value to the school system. *Ferrell v. Gwinnett Cty. Bd. of Educ.*, 481 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007) (finding school police officers were subject to administrative exemption from FLSA's overtime provisions). The District asserts that the record demonstrates that the plaintiffs' primary duties were comprised of non-manual work directly related to the business operations of the District which included the exercise of discretion and independent judgment with respect to matters of significance regarding the safety, training, and well-being of students and faculty members. (Doc. 30, at 7). On the summary judgment record before us, viewed in the light most favorable to the non-moving defendant, we agree.

With respect to the issue of non-manual labor, the record shows that the plaintiffs: (1) make sure entries and exits are secure; (2) complete walking checks throughout the interior and exterior of the buildings; (3) are visible in the hallways; (4) prepare building budgets for the drug, alcohol, and safety program known as D.A.R.E.; (5) assist administrators with disciplinary issues including bus discipline, truancy, fights (including physically breaking-up a fight), and weapon possession;

(6) attend assemblies and other group events which include speaking on safety topics and soliciting speakers for those events;  (7) participate in the student assistant program; (8) train administrators and professional staff on lockdown and evacuation procedures and design protocols in the event of District wide emergencies; and (9) teach classes to students on issues such as safety, drugs, and gangs (D.A.R.E program).  Although the record is silent as to the amount of time the plaintiffs spent on such matters, these duties are not typically performed by rank and file police officers employed by ordinary law enforcement agencies, and the duties illustrate the unique value and function that the plaintiffs provided to the overall school system.  *See Ferrell,* 481 F. Supp. 2d at 1344.  *Ferrell* is particularly instructive on this issue.  There, the plaintiffs, referred to as "school resource officers,"[2] were salaried police officers employed by the defendant school system who were responsible for proactively preventing and responding to safety and security problems.  They were paid a salary substantially higher than the standard salary for a police

---

[2] The position of "school resource officer" in *Ferrell* is different than the "school resource officer" position described by Mr. Lordi in his deposition. In *Ferrell*, the plaintiffs were employees of the school system, much like the plaintiffs here, not employees of a municipal or state police force as were the "school resource officers" referenced in Mr. Lordi's testimony.

officer with comparable experience.  Each plaintiff maintained an office at a school in his cluster and spent a portion of his day in his office or the offices and classrooms of faculty and staff, completing paperwork, working on his computer, making telephone calls, conducting interviews, holding meetings, and making presentations. Although those plaintiffs had offices, they were expected to spend a majority of their time out of the office performing other duties.    *Id.* at 1342.  In *Ferrell*, the court found that the primary and most important function of the officer was to provide for the safety and security of the people and property in their clusters.  In doing so, the court found that an officer performs the hybrid function of an in-house law enforcement officer with certain quasi-administrative responsibilities.  Thus, many duties of those officers did not constitute manual work.  *Id.* at 1344.  The court conceded that the plaintiffs did perform *some* manual work—such as making arrests and breaking up fights—but concluded that this did not preclude administrative status where the bulk of the officers' work was non-manual. *Id.* at 1345. In this case, the record is silent as to how much of the plaintiffs' time was spent making arrests, issuing summary citations, or breaking up fights on campus.

The plaintiffs maintain, and we agree, that the Department of Labor's regulations expressly state that police officers typically are not administratively exempt because "their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200." *See* 29 C.F.R. § 541.3(b)(1)(3). (Doc. 27, at 9). However, the *Ferrell* court was faced with the same argument and the court addressed the issue by distinguishing police officers who work for a law enforcement agency from police officers who are employed by a school system, due to the difference in the nature of their respective employers' businesses. *Ferrell*, 481 F. Supp. 2d at 1346; *see also Martin*, 940 F.2d at 903 ("[I]t is important to consider the nature of the employer's business when deciding whether an employee is an administrative or production worker"). Further, the *Ferrell* court drew the following distinction:

> [I]ndividuals whose primary duty is law enforcement are typically found to be non-exempt when employed by a law enforcement agency because the employees are producing the end product that the agency exists to produce— security to the public. Stated another way, because law enforcement agencies are in the business of providing protection and security to the public, police officers are the line workers of the police department.

> By contrast, the School System is in the business
> of educating students, not providing law
> enforcement. Thus, rather than producing the
> School System's end product of education,
> Plaintiffs are servicing the School System's
> business of education.

*Ferrell*, 481 F. Supp. 2d at 1346-47. *Ferrell* concluded that the officers were not "producing" the end product that a school system exists to create—education—and they are therefore distinguishable from police officers who work for a law enforcement agency. *Id.* at 1347.

In addition to determining whether the plaintiffs' work is considered non-manual in nature, we must also determine whether there are disputed material facts relating to whether the plaintiffs exercised discretion and independent judgment during their employment—the third prong of the analysis. With respect to the third prong, the regulations state that:

> In general, the exercise of discretion and
> independent judgment involves the comparison
> and the evaluation of possible courses of conduct
> and acting or making a decision after the various
> possibilities have been considered. The term
> 'matters of significance' refers to the level of
> importance or consequence of the work performed.

29 C.F.R. § 541.202(a). Section 541.202(c) further provides that "[t]he exercise of discretion and independent judgment implies that the employee has the authority to make an independent choice, free from immediate direction or supervision."

Employment that involves 'discretion and independent judgment' can be described by such factors as:

> whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or

resolving grievances.

29 C.F.R. § 541.202(b).

The exercise of discretion and independent judgment does not require that the decision have finality and complete absence of review. 29 C.F.R. § 541.202(c). It could take the form of a recommendation or a decision that was revised at a higher level and still, for this purpose, be considered an independent decision made within her discretion. *Id.*

Here, the school police officers gave advice to the school on safety and security matters; served as a liaison with local law enforcement, conduct investigations and determined whether to issue citations for summary offenses under the Pennsylvania Crimes Code or for violations of the Pennsylvania Truancy Law; investigate criminal law violations and respond to police-related incidents occurring in school or on school property; take law enforcement action as necessary and inform the administrator as soon as practical; and meet with students and provide law enforcement related counselling, guidance, and referrals to other agencies as needed. (Doc. 23-1, at 101-02). As a result, the school police officers meet the third element of the administrative capacity exemption.

Viewed in the light most favorable to the non-moving defendant, the record sufficiently demonstrates that the plaintiffs' primary duties are comprised mostly of non-manual work directly related to the general business operations of the District and include the exercise of discretion and independent judgment with respect to matters of significance. Therefore, the plaintiffs' motion on this issue will be denied.

### 2. Remaining Issues

The plaintiffs also seek summary judgment on whether the District violated the FLSA by failing to pay the plaintiffs overtime, whether its failure to comply was willful, and whether it is liable for liquidated damages for failure to demonstrate good faith and reasonable grounds for its failure to comply. Having determined immediately above that there remains a genuine dispute of material fact with respect to whether the plaintiffs were correctly classified as exempt employees under the FLSA, we find that a decision on these remaining issues would be merely advisory, and thus we will deny the plaintiff's motion on these issues. *See Williams v. Bier Int'l, LLC*, No. 14CV03894-LTS-JCF, 2015 WL 4461668, at *3 (S.D.N.Y. July 21, 2015); *see also Jones v. Pawar Bros. Corp.*, ___ F. Supp. 3d ___, 2020 WL 364168, at *10 (E.D.N.Y. Jan. 22, 2020) ("When

courts have decided the question of willfulness at the summary judgment stage, either the FLSA violation was due to a misclassification of the plaintiff as being exempt, or there existed no genuine dispute that the employer had been on notice that it was subject to the FLSA.").

## IV.   Conclusion

For the foregoing reasons, the defendant's motion for partial summary judgment (Doc. 20) will be granted in part and denied in part, and the plaintiff's motion for partial summary judgment (Doc. 22) will be denied.

An appropriate order follows.


Dated: March 30, 2020                    ***s/Joseph F. Saporito, Jr.***
                                          JOSEPH F. SAPORITO, JR.